Would the party step forward in Rite Aid v. 1199? Good morning, Your Honors. My name is Jed Mendelson. I am accompanied today by my colleague to my left, Tyler Sims, and two upper-level members of labor relations management at Appellant Rite Aid. The issue presented, Your Honors, is whether the arbitrator issued an award that failed to draw its essence from the labor contract and, in doing so, substituted his own brand of industrial justice in place of the labor contract language upon which the parties had agreed. So the decision—I had a very hard time understanding your argument. The decision of the arbitrator here refers to Paragraph E. It refers to Paragraph C. It refers to Paragraph D. It looks at the use of the term contribution rate compared to the term URR. And I take it that what you're asking us to do in the context of reviewing the confirmation of an arbitral award is to conclude that the arbitrator here failed to really review the agreement. Your Honor, you're correct that the arbitrator in his award acknowledged each of those sections, and we submit to you that he did not draw the essence of his award from the agreement, from the obvious. If I could direct Your Honors to pages 206 and 07 of the Joint Appendix, there we have the provisions of the agreement. And if you look at the second line in Paragraph C, it says, Contribution Rate Parenthesis URR Close Parenthesis. If you go to 207 under Subsection D, it says, Contribution Rate Parenthesis NBF URR Close Parenthesis. And then we'll talk about it in a moment, Your Honors. In Subsection E, toward the very bottom, there's a sentence that reads, quote, If the employer challenges such diversions, it shall continue to pay the URRs set by the trustees until such time as the merits of that challenge are determined by a tridunial. And the arbitrator mentioned each one of those provisions. Yes, Your Honor. And while we recognize that the standard here is one of great deference to arbitrators, we submit to you this is a narrow class of case, and I'm going to explain why very briefly in a moment. But I first want to say to you that no person rationally could look at the language that I just pointed to you and not conclude that the term contribution rate, by definition in this agreement, is URR. The two terms are equated. And there's a reason for that. Because for decades, the contribution rate was the URR. And further, I note to you, the record supports the point that this language was drafted by the union. And so we submit to you that when an agreement over and over interchangeably, consistently, repeatedly uses the word contribution rate and URR both together and in lieu of one another, and if you read through paragraph C in particular, but D and E as well, you will see that those terms are used interchangeably. No conclusion was possible other than those two terms are the same term. So the first core point of our argument is that the arbitrator disregarded the plain language of the agreement. And the Supreme Court and this Court have issued decisions recognizing that great deference must be paid to arbitrators. It is nonetheless the case that when an arbitrator deviates from the plain language of the agreement, the courts have to step in, because in those instances, the arbitrator is rewriting the contract. Another way... Your argument derives from the use of contribution rate and URR in sections C and D. The arbitrator rejected your argument because it thought the broad language of section E allowed the change. You argued back that no, section E was limited by the interchangeable use of the terms, the contribution rate and URR terms. What I'm having difficulty with is I understand both sides of that view. I'm not sure how I say that the arbitrator's rejection and reliance on the broad language of section E lacks a colorable basis in the contract. As I said, I understand that you have a colorable argument for a contrary interpretation, but he chose to think that the section E language was not so limited. How do we say that's not colorably grounded in the contract? Because we all know as a canon of construction that the terms of an agreement must be read in their entirety and be read consistently. The term any, the arbitrator in his award said not only that it's broad, but it's all-encompassing. He was completely mistaken and exceeded his power in saying that. The term any is delimited by the terms that it is modifying, and here it is modifying contribution and URR, or better said, they're modifying it. He could not read the term reflexively as so many people do, any, to mean that he can do and the trustees can do anything they want. It's the contrary. The term URR was the contribution rate as the parties agreed and the union proposed. And I submit to you if you look further in E, and this was my point, look at the language about diversion. The language of the contract says that in the event there's a diversion, which means that monies that are contributed to the fund are used for some purpose other than the fund in issue. There are several funds, and that's an issue between the parties. It says that during the pendency of that dispute, the employer shall continue to pay the URR. By changing the contribution methodology, the arbitrator undermined and essentially nullified that provision. He couldn't do that. The parties had agreed that the URR and contribution rate are one and the same, and that's exactly what the employer was allowed to pay in the event of a diversion dispute. And once he said that some other contribution . . . I think that the arbitrator specifically deals with that as well on Appendix 29. Page 29, sir? Appendix page 29. I mean, just to go back to the question, he seems to grapple with each one of the issues that you have pointed us to. And you disagree, and there might be a good basis for disagreement, but that's not a basis to overturn an arbitral . . . It is, Your Honor, if he disregards the plain language. There's case law in this circuit that says . . . The plain language you say doesn't say that. What you're doing is saying, look at this language in light of their course of dealings. It's not that he's ignoring the plain language. It's that he thinks the language does not support your argument, which requires him to go outside the contract now. Am I missing something? Yes, Your Honor. I'm not suggesting the course of dealing, because it was for decades that it is a course of dealing. I'm using that as a fact to explain why the language is so crystal clear. It says contribution rate, URR, parenthesis. That's how lawyers and other people define terms. The parties didn't have to use loads of language because there was such a history here. I submit to you, Your Honor, that the case law in the circuit says that because an arbitrator makes, quote, noises of contract interpretation, doesn't make his decision unassailable. The very point here is he exceeded his power because he rewrote the contract, and that's exactly what he is precluded from doing. There are two other points, Your Honor. I'll just touch on them briefly, and then I left two minutes for rebuttal. One is that if you thought Ennie was ambiguous, and we don't, we think the language of the contract is clear, but both parties put in bargaining history. The bargaining history is clear-cut. The union at the table told the company, and it's undisputed, that if you want to be party to a contract with us, you have to agree to a URR, and the record supports that. No discussion of contribution rate, no discussion of anything else. And lastly, the record supports that the arbitrator, at the end of his opinion, introduced external considerations. He acknowledged there's no evidence of any fiscal solvency issue, and then said, I think I have to be deferential to the trustees. While he wasn't reviewing their decision per se, he was reviewing the contract to see whether their decision to change the contribution methodology was permitted, and it's obvious that he allowed his concerns about deferring to trustees, whose very decision he was reviewing influenced his thinking. But this is also the same arbitrator who says somewhere else in the decision that on the equities, Rite Aid might have the better argument. But when he looks at the language of the agreement, you lose. But Your Honor, what he really was saying was, there's no meeting of the minds here. Rite Aid entered into this agreement understanding one thing, but the language says something else except the language doesn't. No, no, no. What he really was saying was that paragraph E is clear and unambiguous, and it favors the other side, favors the union. But Judge, I understand what he said, and I'm submitting to you that the word any on a reflex can't be read as people are reading it here. The answer is any is delimited by the terms around it, and that's the fundamental point here. Just because the word any appears doesn't mean that there's carte blanche to do various things. Thank you. Good morning, Your Honors. May it please the Court, my name is Allison Bellowvin, I'm here with my colleague Jessica Apter. Microphone. Sorry. Better? Better. And we're here representing 1199 SEIU, the appellees in this case. No matter what words the company uses and how it tries to style its arguments, the position of the company at bottom here is that the arbitrator simply misinterpreted the contract. Each and every one of its arguments is an exercise in rhetorical gymnastics, an effort to persuade this Court that this appeal is about something other than the fact of Rite Aid's satisfaction with the result of the arbitration proceeding. The law, as you know, is straightforward and well settled. As long as the arbitrator arguably construed and applied the collective bargaining agreement, the Court shouldn't overturn his decision. The crux of Rite Aid's argument, as you heard counsel say, is that the terms contribution rates and URRs mean the same thing, and that by concluding otherwise, the arbitrator somehow exceeded his authority or imposed his own brand of industrial justice. But this is really just another way of saying that Rite Aid disagrees with the arbitrator's interpretation of the contract language. An examination of the award demonstrates the arbitrator more than satisfied his obligation to construe and apply the terms of the collective bargaining agreement. It's clear from the award that he reviewed the language of the contract. Both Section E, which includes Rite Aid's obligation to adopt any changes established by the trustees to the contribution rates, as well as the other provisions of the agreement that refer to the URR, that he considered the evidence of the party's bargaining history related to those contractual provisions, evidence presented by both sides at the arbitration, and that he fully considered Rite Aid's argument that the contract language and the bargaining history required the conclusion that Rite Aid's obligation to adopt changes to the contribution rates was somehow limited to changes that maintained a single contribution rate applicable to all participating employers. And he considered all of those things and ultimately concluded instead that the clear contract language required Rite Aid to adopt any changes to contribution rates. He said any means any, and that's not an unreasonable thing to say. But now your adversary's argument is contribution rate means URR, and he points to the parenthetical use of that right after contribution rate in C and D. So tell us how an arbitrator could construe contribution rate as not equaling the URR. The arbitrator could and did, in fact, say that when the parties meant to say URR, they said URR. In Section C and in Section D, the paragraphs there set forth specific contribution rates, which were at that time URR. In Section E, the parties used a different term. They didn't use URR. They used contribution rates, and they used any contribution rates to signal that the trustees can make determinations about contribution rates to be more than simply URRs. They were URRs at the time or different than, correct. And I think it's worth noting what actually happens here, which is that the trustees moved from a single URR, a single contribution rate applicable to all participating employers, to two different contribution rates, one applicable to employers that are members of a multi-employer bargaining association called the League of Voluntary Hospitals, and another rate applicable to non-league participating employers, including Rite Aid. The arbitrator correctly determines in this case not to consider the equities, and this court should not do anything different. But to the extent that there are any concerns about equities here, that's important, because of the two rates, the league rate and the non-league rate, the non-league rate is, in fact, lower. The rate that Rite Aid is required to pay, that the arbitrator found Rite Aid is required to pay and that the district court also found Rite Aid is required to pay, is lower. And that's why we haven't heard anything throughout any of these proceedings, not at the arbitration, not in the district court, not in the company's written submissions to this court, and not in its argument here today about any unfairness Rite Aid is facing vis-a-vis the other contributing employers. Their rate is actually lower. Why did you delay requesting or moving for arbitration? I don't believe there was a delay in requesting a ruling for arbitration. There was a timely arbitration proceeding filed. There was an amount of time that there are over 300 contributing employers to the National Benefit Fund. At any given time, multiple employers are in delinquency and I think as an administrative matter, it took the fund some period of time to deal with Rite Aid's delinquency, but there's no dispute here that there was a timely demand for arbitration filed. No, I'm not suggesting that, but there was some delay. There was a period of time from when the delinquency began to when the arbitration occurred, correct. Thank you. Thank you. Thank you, Your Honor. First of all, the Supreme Court's decision in MISCO states that an award is reversible if it ignores plain language, and so we want to emphasize that even Section E references the URR, and I understand that a court would be concerned about a slippery slope and issuing a decision that could open the floodgates, but we submit to you that this is just the kind of case that doesn't do that. There are a few contracts with the homogeneity and the interchangeability of the terms contribution rate and URR as they exist here, and so we submit to you that this is a very unusual case because most cases don't have language that is quite so homogeneous and interchangeable as those two terms appear repeatedly through Section C through E. You know, when I asked counsel how to reconcile the three sections, she explained that C and D, which are the ones that put URR in parentheses next to contribution rate, deal with particular changes and that were tied to the URR, that Section E, which does not use the parenthetical in speaking of any contribution rate, is not so limited and that that's why the arbitrator's conclusion does not ignore the contract. I'm eager to hear your response to that. The answer is Section E, while not specific to one particular fund, is more of an omnibus provision, and therefore the parties, having defined so clearly what contribution rate means in Section C and D, didn't need to do it again, but they did reference the URR in that freestanding sentence. But only in the context of if the employer challenges such diversions, it shall continue to pay the URRs. Yes, sir. But, you know, the prior part of it talks about contribution rates. Yes, sir. But the point is that by nullifying the URR, the arbitrator nullified that sentence, which very clearly speaks to the point that the employer, in the event of a challenge on diversions— This seems to undermine your argument. It suggests that there are going to be changes to the contribution rate. You may argue about them, during which time you keep paying the URR. But it doesn't suggest that the changes to the contribution rate are somehow possible only if there's a change to the URR. No disrespect, Your Honors, that's an incorrect reading. It's not about a dispute about contribution rates. It's about a dispute about diversion of contributions. That is not a dispute about the change in the contribution rate. It's about a very sort of narrow problem that the parties have discussed in the table that's revealed in the transcript to the arbitration hearing, but has nothing to— That's sort of your adversary's argument. All of this sounds like what you're challenging is how the arbitrator interpreted the contract, not that he, you know, threw the contract out the window and said, I'm going to do what I want to do. Your Honor, I have to respectfully disagree and say the point of our argument is that the arbitrator did not have the power, and because he did not observe the plain language, he exceeded his power to do this. I did want to say one more thing that I diverted from before without mentioning. In the arbitration hearing, Union Counsel, not Ms. Belevin, a colleague of hers, questioned Mr. Hinkle, who's in the courtroom, and asked him in Section E, is there any connection between the word any and URR? And then she herself corrected her question and pointed out the diversion language. And I submit to you that her question, asking a witness whether there's anything in the agreement, in those provisions that connects URR to the term any, itself is dispositive in our favor. Her own question realized you can't read the word any in isolation. Dispositive in your favor? Yes, sir, because she recognized you can't read it in isolation. You have to read it in the context of the entirety of the applicable provisions. And so thank you. Thank you, Your Honor. Thank you. We're going to take the case under advisement.